## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Barry Sewall, Shamika Gregory, Jerome Gregory, Frank Richmond, Michael McDermott, Kelley McDermott, Chance Gallo, Sheila Nasilasila, Erin Wise, Michael Curran, Christa Curran, Latrice Jones-Byrd, LaQuita Dasher, Ayoka Durham, Marcus Durham, Donna Sheard, Richard Allen, Gabrielle Todd, Gina Johnson, and Lionel Johnson each individually and on behalf of all others similarly situated, | Court File No.: _____ |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| Home Partners Holdings LLC, and OPVHHJV LLC, d/b/a Pathlight Property Management, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PARTIES ........................................................................................................... 3

JURISDICTION AND VENUE ........................................................................... 6

FACTUAL ALLEGATIONS ............................................................................... 7

I.      Defendants' Scheme. .............................................................................. 7

II.     Defendants' Form Contracts Shift the Burden of Maintenance, Repair,
        and Insurance onto Tenants. ................................................................ 13

        A.  *The Master Resident Liability Program* .................................... 17

        B.  *The UBSF* .................................................................................... 20

        C.  *HVAC Filter Fees* ........................................................................ 21

        D.  *Legal Fees* ................................................................................... 22

        E.  *Late Fees* ..................................................................................... 22

III.    Plaintiffs' Experiences ......................................................................... 23

        A.  Donna Sheard and Richard Allen ................................................ 23

        B.  Gabrielle Todd .............................................................................. 24

        C.  Lionel and Gina Johnson .............................................................. 25

        D.  Barry Sewall ................................................................................. 26

        E.  Shamika Gregory and Jerome Gregory ........................................ 28

        F.  Frank Richmond ............................................................................ 29

        G.  Michael McDermott and Kelley McDermott ................................ 31

        H.  Chance Gallo ................................................................................ 32

        I.  Sheila Nasilasila .......................................................................... 33

        J.  Erin Wise ...................................................................................... 33

        K.  Michael Curran and Christa Curran ............................................ 34

        L.  Latrice Jones-Byrd ....................................................................... 36

        M.  LaQuita Dasher ............................................................................ 37

        N.  Ayoka Durham and Marcus Durham ............................................ 38

LITIGATION HISTORY .................................................................................. 39

CLASS ACTION ALLEGATIONS ................................................................................ 42

TOLLING OF THE STATUTE OF LIMITATIONS ................................................... 46

COUNT I ...................................................................................................................... 46

COUNT II ..................................................................................................................... 52

COUNT III .................................................................................................................... 53

COUNT IV .................................................................................................................... 55

COUNT V ..................................................................................................................... 56

COUNT VI .................................................................................................................... 57

COUNT VII ................................................................................................................... 58

COUNT VIII .................................................................................................................. 59

COUNT IX ..................................................................................................................... 62

COUNT X ...................................................................................................................... 67

COUNT XI ..................................................................................................................... 69

COUNT XII .................................................................................................................... 69

COUNT XIII ................................................................................................................... 73

COUNT XIV ................................................................................................................... 73

COUNT XV .................................................................................................................... 75

PRAYER FOR RELIEF ................................................................................................ 76

Barry Sewall, Shamika Gregory, Jerome Gregory, Frank Richmond, Michael McDermott, Kelley McDermott, Chance Gallo, Sheila Nasilasila, Erin Wise, Michael Curran, Christa Curran, Latrice Jones-Byrd, LaQuita Dasher, Ayoka Durham, Marcus Durham, Donna Sheard, Richard Allen, Gabrielle Todd, Gina Johnson, and Lionel Johnson, each individually and on behalf of all others similarly situated (the "Class"), bring this action against Home Partners Holdings LLC and OPVHHJV LLC, d/b/a Pathlight Property Management (collectively "Defendants"), and allege as follows:

## INTRODUCTION

1.      Defendants are corporate landlords who collectively own, lease, and manage approximately 31,000 homes in 32 states and the District of Columbia. Home Partners began in Chicago, Illinois, and was formerly known as Hyperion Homes.

2.      Defendants operated two rental programs: a "right-to-purchase" (RTP) program, which is the primary means through which they acquire single family residences, and a "non-right-to-purchase" rental program, through which they rent out homes they have already purchased (NRTP).

3.      Defendants represent for every home that is available for lease, that the home is "[p]rofessionally managed by Pathlight Property Management, the exclusive property manager for Home Partners of America, offering excellent customer service,

24/7 emergency maintenance service, online application and payments, and pet-friendly options."[1]

4.       Despite these promises, Defendants routinely require tenants to enter contracts of adhesion that purport to waive and modify the warranty of habitability through several different lease provisions found throughout Defendants' uniform contracts.

5.       In addition, Defendants, through form contracts of adhesion, require tenants to agree to take on maintenance and repair obligations that otherwise would be borne by Defendants. In their leases, Defendants falsely state that the tenants' rental rates were negotiated and would otherwise be higher but for the tenants' alleged agreement to maintain and repair.

6.       In reality, Defendants unilaterally set rental rates, without assigning any consideration for the tenants' alleged agreement or compensating the tenants for the tasks and responsibilities that tenants may be handling.

7.       During and at the end of tenancies, and using the same form leases, Defendants routinely charge their tenants for payment of normal wear and tear damage, and pre-existing or other damage to Defendants' real property which was not caused by the tenants at all. This conduct also violates the warranty of habitability and statutory consumer protection laws.

---

[1] https://www.pathlightmgt.com/search
[https://web.archive.org/web/20241203073657/pathlightmgt.com/search] (last visited December 4, 2023).

8.    Finally, under the leases, Defendants assess tenants with numerous lease administration and property management fees, including but not limited to, a "pay-to-pay" utility fee, an HVAC filter fee, late fees, and the costs of insuring Defendants' property.

9.    The reason for Defendants' use of their misleading form leases is simple: Sophisticated corporate landlords intentionally include unenforceable or misleading clauses in their leases "trusting they could profit from inserting such terms. [These clauses] are likely to mislead tenants into believing that they reflect the legal state-of-affairs."[2]

10.    In addition to seeking damages, this action seeks to enjoin Defendants from continuing to use their misleading or unenforceable leases and a return of the monies paid to Defendants through their illegal leases.

## PARTIES

11.    Barry Sewall ("Sewall") is an adult residing in Minnesota, and is a citizen of Minnesota.

12.    Shamika Gregory is an adult residing in Minnesota, and is a citizen of Minnesota.

---

[2] Meirav Furth-Matzkin, *Unenforceable and Misleading Clauses in Consumer Contracts: Evidence from the Residential Real Estate Market*, JOHN M. OLIN CTR. FOR L., ECON., & BUS FELLOWS (June 2015), http://law.harvard.edu/programs/olin_center/; *see also* Furth-Matzkin, *On the Unexpected Use of Unenforceable Contract Terms: Evidence from the Residential Real Estate Market*, 9 J. LEGAL ANALYSIS 1 (2017).

13. Jerome Gregory (collectively with Shamika Gregory, the "Gregorys") is an adult residing in Minnesota, and is a citizen of Minnesota.

14. Frank Richmond ("Richmond") is an adult residing in Washington, and is a citizen of Washington.

15. Michael McDermott is an adult residing in Washington, and is a citizen of Washington.

16. Kelley McDermott (collectively with Michael McDermott, the "McDermotts") is an adult residing in Washington, and is a citizen of Washington.

17. Chance Gallo ("Gallo") is an adult residing in Washington, and is a citizen of Washington.

18. Sheila Nasilasila ("Nasilasila") is an adult residing in Washington, and is a citizen of Washington.

19. Erin Wise ("Wise") is an adult residing in Washington, and is a citizen of Washington.

20. Michael Curran is an adult residing in Colorado, and is a citizen of Colorado.

21. Christa Curran (collectively with Michael Curran, the "Currans") is an adult residing in Colorado, and is a citizen of Colorado.

22. Latrice Jones-Byrd ("Jones-Byrd") is an adult residing in Georgia, and is a citizen of Georgia.

23. LaQuita Dasher ("Dasher") is an adult residing in Georgia, and is a citizen of Georgia.

24.     Ayoka Durham is an adult residing in Maryland, and is a citizen of Maryland.

25.     Marcus Durham (collectively with Ayoka Durham, the "Durhams") is an adult residing in Maryland, and is a citizen of Maryland.

26.     Donna Sheard ("Sheard") is an adult residing in Illinois, and is a citizen of Illinois.

27.     Richard Allen ("Allen") is an adult residing in Illinois, and is a citizen of Illinois.

28.     Gabrielle Todd ("Todd") is an adult residing in Illinois, and is a citizen of Illinois.

29.     Gina Johnson is an adult residing in Illinois, and is a citizen of Illinois.

30.     Lionel Johnson (collectively with Gina Johnson, the "Johnsons") is an adult residing in Illinois, and is a citizen of Illinois.

31.     Defendant Home Partners Holdings LLC ("Home Partners") is incorporated in Delaware with its principal place of business in Chicago, Illinois.

32.     Defendant OPVHHJV LLC, d/b/a Pathlight Property Management ("Pathlight") is a subsidiary, agent, and alter ego of Home Partners of America. Pathlight is incorporated in Texas with its principal place of business in Texas. Pathlight is wholly owned by Home Partners.

33.     Upon information and belief, Defendant Home Partners or one of its subsidiaries operates and purchases homes through separately incorporated limited liability companies ("Non-named LLCs"), but Defendant Home Partners (or one of its

5

officers or employees) is a member of those Non-named LLCs. These separate LLCs are typically incorporated in the State of Delaware with their principal place of business in Chicago, Illinois.

34.     These other Non-named LLCs were, at all relevant times, the agents, servants, employees, alter-egos or joint venture of Defendant Home Partners, and acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture, and with the permission and consent of each of the other Defendants.

35.     These Non-named LLCs are the signatories on leases with the Plaintiffs or putative Class members.

## JURISDICTION AND VENUE

36.     This Court has original subject matter jurisdiction over this controversy pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because Plaintiffs and members of the Class are citizens of states different than Defendants' home states, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs.

37.     This Court has personal jurisdiction over Home Partners Holdings LLC because it has conducted substantial business in this District and intentionally and purposefully markets, promotes, and places its homes into the stream of commerce in this District and throughout the United States.

38.     This Court has personal jurisdiction over OPVHHJV LLC, d/b/a Pathlight Property Management, because it serves as the property manager for all of Defendants' rental properties in this District.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants marketed, advertised, leased and sold affected homes, as well as conducted extensive business, within this District.

## FACTUAL ALLEGATIONS

### I.     Defendants' Scheme.

40.     At all relevant times, Home Partners' website stated, "[f]rom the beginning, Home Partners and Pathlight communicate with residents throughout the entire process. Once the house has closed and the Make-Ready renovations have been completed, Pathlight will send a Welcome Email to residents that outlines the move-in process and answers questions that may arise during the lease term."[3]

41.     In the wake of the 2007 housing market crash, as thousands of American families lost their homes, the federal government launched a pilot program that allowed private investors, some of whom facilitated the financial crisis in the first place, to purchase swaths of foreclosed homes from Fannie Mae.

42.     Large private equity groups, hedge funds and other large investors spent a combined $36 billion on more than 200,000 homes between 2011 and 2017.

43.     In effect, these large entities are building a new corporate landlord-tenant scheme across the country.

---

[3] https://www.homepartners.com/faqs/Move-In-Pathlight/Pathlight-Property-Management-/When-does-Pathlight-become-the-main-point-of-contact-for-incoming-residents [https://web.archive.org/web/20231208024237/https://www.homepartners.com/] (last visited December 4, 2023).

44.     While large corporate entities have been involved in the housing market since before the 2010 foreclosure crisis, their involvement only continues to grow. These corporate landlords claim their buying efforts will stabilize the country's most dilapidated housing markets. They claim they will be even better landlords than traditional, local landlords by using their capital to maintain the homes, and they claim to make home rentals easy and affordable.

45.     However, over time, these corporations have displaced individual home buyers (or individual landlords and property owners) not only in housing markets decimated by foreclosure, but also in healthy urban, suburban and exurban residential real estate markets.

46.     Against this background, Home Partners (then operating as Hyperion Homes) entered the residential real estate market in 2012 as a real estate investment and property management group, and claimed that by purchasing homes on behalf of residents in markets nationwide, they would help thousands of home-seekers live in a home they otherwise were not yet ready to purchase, under terms that best fit their needs.

47.     Defendants state they rent single-family homes to persons in three primary demographics: (1) recent transferees to an unfamiliar or new city or suburb; (2) persons desiring to live in a single-family home, but who lack the creditworthiness to obtain a mortgage; and (3) persons who want to rent a single-family home but who are "uncertain" about home ownership.

48.     Defendants target these demographics through marketing to real estate agents and online and print advertisements that promote the availability of homes.

49.     Defendants market extensively through their own websites as well as local real estate agencies.[4]

50.     Defendants' two rental programs: the "right-to-purchase" (RTP) program, which was the primary means through which they acquired single family residences, and the "non-right-to-purchase" rental program, through which they rented out homes they have already purchased (NRTP).

51.     The RTP rentals are long-term, up to five years. Each RTP lease contains an automatic renewal provision. The NRTP rental contracts are generally for one-year terms.

52.     In the context of the RTP program, Defendants represent that prospective customers, working with their real estate agents, can pick a home offered for sale, and that Defendants will buy the home for the prospective customers to rent from Defendants, for up to five years. To induce prospective customers to go through Home Partners and the RTP program, Home Partners claims they "buy it and lease it to you with the peace of mind of locked-in rent amounts and purchase prices. Live in the home as a renter with the option to buy it at any point. At the end of your 1-year lease term, you can renew for another year or walk away with no penalties. No

---

[4]https://www.pathlightmgt.com/search?sort=&search_text=&rent=&state=IL&city=&available_date=&beds=&bathrooms=
[https://web.archive.org/web/20240630/homepartners.com/results/il/chicago-metro]
(last visited December 4, 2023).

matter what you decide, we are your partner. […] On average, move-in will be 2 weeks after closing to accommodate any necessary repairs found during our home inspection. […] Your agent facilitates the inspection and will make sure all utilities are on."[5]

53.     Defendants together claim that they expend significant effort and resources to purchase a particular home on the prospective tenant's behalf.

54.     Whether a prospective tenant chooses the RTP or NRTP program, Defendants represent that every home that is available for lease is "[p]rofessionally managed by Pathlight Property Management, the exclusive property manager for Home Partners of America, offering excellent customer service, 24/7 emergency maintenance service, online application and payments, and pet-friendly options."[6]

55.     Defendants also represent that their houses are "qualified," "move-in ready," and have passed inspection. Defendants do not share the results of any inspection reports with their tenants, and thus tenants are unaware of what repairs, if any, were declined or undertaken.

56.     Before an RTP tenant signs a lease, Defendants send to tenants an "Anticipated Terms" document that makes representations regarding the terms of the lease and states that tenants are responsible for utilities, such as water, trash,

---

[5] https://www.homepartners.com/how-it-works [https://web.archive.org/web/20250118023939/https://www.homepartners.com/how-it-works] (last visited December 4, 2023).

[6] https://www.pathlightmgt.com/search [https://web.archive.org/web/20241203073657/https://www.pathlightmgt.com/search] (last visited December 4, 2023).

and sewer, lawn and landscape maintenance, snow/ice removal, and "other day-to-day maintenance." The "Anticipated Terms" document also states Defendants expect tenants to maintain the home as if it were the tenants' own, and that tenants are required to maintain their own general liability renters' insurance. The terms do not disclose that tenants may later be force-placed into Defendants' own insurance if they do not obtain their own renters' insurance.

57.     Defendants' Anticipated Terms, leases and other pre-lease materials are drafted by Home Partners in Chicago, Illinois. Tenants communicate with and receive lease documents for signature from Home Partners' leasing, acquisitions, closings and applications teams, which are also based in Chicago. Tenants receive these pre-lease documents and the leases themselves from Home Partners' leasing and acquisitions teams, and Home Partners' leasing team facilitates tenants' wiring of their initial security deposit.

58.     Defendants claim to "take the responsibility of managing your home's safety and maintenance seriously. Our team is always ready to handle large service requests, but we kindly ask that residents take care of smaller maintenance issues themselves."[7]

59.     But prospective customers are not provided a complete list of the obligations and "service requests" and "maintenance issues" that they will be

---

[7] https://app.pathlightmgt.com/help/detail/General-Maintenance/6157473947931/What-are-resident-and-Pathlight-maintenance-responsibilities
[https://web.archive.org/web/20240404024725/https://app.pathlightmgt.com/help/home] (last visited December 4, 2023).

required to take on as tenants, which include but are not limited to managing pest infestations, lawn care, snow removal, and repairing appliances.

60.     Nor do Defendants fully disclose the additional fees tenants will be required to pay under the lease, including the cost of insuring Defendants' property, paying for HVAC upkeep through an HVAC filter fee charge, and paying for other lease administration expenses connected to utility billing or Defendants' attempts to evict tenants, even when they are not prevailing parties in an action.

61.     For each house, Defendants set a monthly base rent for each year in which a tenant occupies a house.

62.     Defendants state and admit they do not negotiate these amounts with tenants.[8]

63.     Nonetheless, in contradiction of the foregoing statements, which are provided to the general public and tenants before they sign any lease, Home Partners represents in its form adhesion leases that "[t]he amount of Rent was agreed upon based on the express understanding that Tenant will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Tenant's agreement to maintain the Premises at its cost in accordance with the terms of this Lease, Landlord would have charged a higher rent amount."

---

[8] https://app.pathlightmgt.com/help/detail/Lease-Information/360043853871/Is-rent-negotiable
[https://web.archive.org/web/20240404024725/https://app.pathlightmgt.com/help/detail/Lease-Information-Renewals] (last visited December 4, 2023).

64. Home Partners does not apply or credit any amount paid in rent or on maintenance or repairs during the lease term to reduce the rent.

65. Home Partners does not credit the value of the services tenants provide to maintain Defendants' properties toward the rent, nor represent to tenants what the amount of rent would otherwise be but for the agreement to repair and maintain the property.

66. At bottom, and as further described herein, Defendants design their marketing to induce and convince prospective customers that they are renting a specially-chosen, i.e., "qualified" and quality, home that is different than, and an alternative to, a traditional rental. Then, Defendants convince consumers to agree to take on substantial homecare burdens foisted on tenants by Defendants' adhesive form leases.

67. Despite their effort to establish an extra-legal relationship with their tenants through these elaborate contracts of adhesion, Defendants cannot write their way out of their statutory legal obligations to their tenants.

## II. Defendants' Form Contracts Shift the Burden of Maintenance, Repair, and Insurance onto Tenants.

68. Since 2012, Defendant Home Partners has included provisions in its carefully crafted form leases that illegally purport to shift its repair and maintenance obligations onto tenants, as well as other fees associated with lease and property management administration. While Home Partners names one of its various Non-named LLCs as the Landlord in its leases, the Non-named LLC entity is the agent, servant, employee, alter-ego or joint venture of Home Partners.

13

69.     Initially, Defendant Home Partners disclaims in its form leases any obligation to comply with the Covenants of Habitability, stating, "[r]esident acknowledges that any damage to the Premises beyond Wear and Tear will be presumed to have been caused by Resident. Resident agrees that Owner is leasing the Premises to Resident in its AS-IS, WHERE-IS, WITH ALL FAULTS condition as of the Effective Date and specifically and expressly without any warranties, representations or guarantees, either express or implied, as to its condition, fitness for any particular purpose, merchantability or any other warranty of any kind, nature or type whatsoever from or on behalf of Owner's Agents (all of which are expressly disclaimed by Owner and waived by Resident) and Resident is accepting the Premises on such terms […]"

70.     Defendants also state **"[t]he amount of Rent was agreed upon based on the express understanding that Resident will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Resident's agreement to maintain the Premises at Resident's cost in accordance with the terms of this Lease, Owner would have charged a higher Monthly Base Rent amount"** (emphasis in original). This statement is untrue. Defendants do not negotiate rent.

71.     Defendants' leases purport to exempt Defendants from liability, stating Defendants "shall not be liable for any injury or harm to any person or property caused by a defective condition at the Premises" and Defendants "shall be released and discharged from all Claims arising out of any Resident's, Occupant's or their

14

guests or invitees use of, or acts or omissions in or about the Premises or arising out of this Lease."

72.     These provisions purport to exempt Defendants from liability for damages for injuries to tenants and their property resulting from Defendants' negligence in the operation or maintenance of their rental properties in violation of law and are therefore void and wholly unenforceable.

73.     These provisions are designed to obscure, mislead, and misrepresent Defendants' true legal obligations to renters, and constitute false statements of fact and law.

74.     Defendants fail to disclose that their extensive "Residential Lease Agreement" cannot limit a tenant's rights or change the nature of the traditional landlord-tenant relationship.

75.     Defendants' "as-is" and burden-shifting repair provisions mislead consumers about their guaranteed rights and remedies under applicable state law by misrepresenting to consumers that they, not Defendants, are required to keep Defendants' properties in reasonable repair, and further mislead consumers into paying costs associated with Defendants' lease management and administration. Thus, in addition to misrepresenting tenants' rights, Defendants' leases are agreements with tenants that purport to waive or modify the Covenants of Habitability in direct violation of the law.

76.     Defendants include lease provisions that unfairly shift responsibilities for maintenance, repairs, and administrative tasks to tenants. These provisions

violate state laws and mislead tenants into believing that signing the lease means waiving their right to habitable housing. Such unlawful provisions have and continue to have the effect of fraudulently stripping consumers of their legal rights and burdening them with repair efforts and expenses that the law explicitly requires Defendants to bear.

77. When purchasing homes for re-lease, Defendants obtain independent inspections and property appraisals, allegedly for the benefit of the tenant, yet under Defendants' policies, the inspection reports and appraisals are not provided to tenants.

78. Instead, these inspections and appraisals are given to Defendants and undertaken on Defendants' behalf prior to Home Partners' purchase of the home. As owners and property managers of the home, Defendants are in the best position to obtain and provide that information. However, no Defendant discloses the existence of any pre-existing damage to the home of which they may have already been aware.

79. Nor do Defendants disclose the results of municipal inspections. Accordingly, tenants may not be on notice of conditions at the property to review and report during the tenancy, even conditions affecting habitability such as prior mold or mildew.

80. Despite its claim that it "is happy to handle large service requests, and we ask that residents take care of smaller maintenance issues," Pathlight, as the property management arm of Defendants, does not have local staff to handle "large service requests." Instead, Pathlight contracts with a third party, SMS Assist, which

determines whether a tenant's maintenance request will be fulfilled by a local vendor under policies and procedures established by Pathlight.

81. Under Defendants' leases, policies, and procedures, tenants may make maintenance and other repair requests by calling a central toll-free number, or by making a request through Defendants' resident web "portal." If a tenant calls in a maintenance request, both Pathlight and SMS Assist make an electronic record of the request, which is stored in a database. Pathlight frequently communicates with tenants who have called by responding through the resident portal with a "You Called Us" or "We Called You" signature line. If the request is directed through the portal, an electronic record is also created and stored in the database.

82. If SMS Assist, Pathlight's agent operating under Pathlight policies and procedures, or Pathlight determines that the request is "resident responsibility," Pathlight will not fulfill the maintenance request and will cancel it.

83. SMS Assist will also request approval directly from Pathlight for certain repairs. If Pathlight denies the request, Pathlight cancels the tenant's work order.

84. Because Pathlight, either directly or through its agent SMS, frustrates tenants' attempts to successfully make maintenance requests, the result is a system whereby tenants, not Defendants, are actually or constructively forced to pay for repairs and maintenance that they are not required to make under the lease or applicable state law.

A. *The Master Resident Liability Program*

85. In addition to paying out of pocket for repairs to Defendants' properties as they arise, or from their security deposits at the end of tenancy, tenants also use

their own funds every month to comply with Home Partners' so-called "liability coverage" requirement.

86. The lease requires tenants to procure renters insurance with general liability coverage in the amount of $300,000 ($500,000 for a house with a pool) for "damage to our property during your lease term."

87. Home Partners requires tenants to name the Defendants and an entity called POPIC LLC, listed in the lease as an "additional interested party" on the policy and provide "written evidence" of the addition prior to move-in.

88. Although Defendants represent in the leases that tenants are free to obtain their own renters' insurance, the insurance must meet Defendants' coverage criteria. If tenants fail to obtain qualified renters' insurance, they are deemed to be in default of their lease.

89. Nevertheless, before the lease is signed, Defendants discourage tenants from procuring outside insurance, stating the "cost of outside coverage may depend on your provider, creditworthiness, and other factors. Also, it may or may not cover personal belongings," and that "using an outside provider may cost $20 a month or more."

90. Instead, Defendants want tenants to use Defendants' own insurance program. Unless and until the tenant provides the requisite proof of renters insurance, Defendants force-place tenants in their "liability waiver" program (also known as the "Master Resident Liability Program," or "MRLP," and identified as

"Replacement Renter Insurance" in the lease). The MRLP is an opt-out, not opt-in, program.

91.     Defendants' MRLP costs tenants $13 per month and is defined as "additional rent" under the lease. Like all rent payments, this additional rent payment is paid to the Home Partners Holdings subsidiary identified as the "Landlord" under the lease. Upon information and belief, a portion of the $13 fee is returned to Defendants.

92.     Defendant Home Partners developed the Master Resident Liability Program in 2018 and 2019 in Chicago, Illinois.

93.     Although Home Partners uses the terms "liability coverage" and "Master Resident Liability Program" in the leases and in other documents, in reality, Home Partners is engaging in the sale of insurance to tenants. Home Partners is not licensed to sell insurance in any state in which it does business.

94.     Unbeknownst to tenants who are forced to participate, this $13 is an insurance premium paid to Defendants' captive insurer.[9] Defendants do not disclose what portion of this amount is reserved to pay administrative costs, or to pay claims for property damage.

95.     What Defendants additionally do not disclose is that they intend for tenants (or their independently procured insurance coverage) to pay for and cover pre-existing, accidental, or normal wear and tear damage to Defendants' buildings

---

[9] *See Sewall, et al. v. Home Partners Holdings LLC, et al.,* 27-CV-22-10389 (Minn. Dist. Ct.) Index No. 202, Order Granting, in Part, and Denying, in Part, Motion for Class Certification.

and real property, not caused by tenants, which are not covered by the typical renters' insurance policy. In other words, Defendants deliberately foist the burden of insuring their own real property onto tenants.

96. Upon information and belief, Defendant Home Partners has collected millions of dollars from tenants nationwide through the MRLP replacement insurance program, none of which benefits the tenants.

### B. *The UBSF*

97. Defendants employ a third party, Conservice, to manage utilities and services kept in Defendants' names, such as water, trash and sewer. Conservice bills the utilities to the tenants, through a separate bill, but all utility amounts are reflected on the tenants' ledgers and tenants can remit payment directly to Defendants.

98. While most tenants understand they have to pay for the utilities they use, they are in fact required to pay even more due to Defendants' "Utility Billing Service Fee" (UBSF). The UBSF is a "pay-to-pay" fee for utilities and services that must be kept in the Landlord and property owners' name, which means tenants pay Defendants for the privilege of also paying for their utilities. Tenants do not have the option to opt out of the UBSF. Though the amount varies state to state, Defendants charge this fee in each state they rent their homes.

99. Plaintiffs and other tenants' UBSF is at least $7.95 per month. Plaintiffs Sheard and Allen pay a $9.95 UBSF, while Todd's UBSF is $7.95.

20

100.   In their Anticipated Terms document, Defendants represent the UBSF is to "reimburse" Defendants for "water and other utilities and services bundled with the water bill."

101.   The leases do not disclose the nature and purpose of this charge. Similarly, Defendants' representations on their website(s) do not disclose the nature and purpose of this charge.

102.   In actuality, the UBSF is a fee Defendants assess to tenants to cover the administrative costs of hiring Conservice to bill tenants for utilities. This is also not disclosed in their form leases or Anticipated Terms.

103.   Upon information and belief, a portion of this fee is returned to Defendants and does not reflect the actual administrative costs of managing utilities via Conservice. In or around the fall of 2024, Defendants provided tenants with the opportunity to opt out of this charge.

**C.   *HVAC Filter Fees***

104.   Defendant also required tenants to pay a fee for their "HVAC Filter Program" in the amount of $15 per month. This amount was non-negotiable. Until November 2023, tenants were not permitted to opt out of the program, even though the filter's stated purpose was to ensure that the "air quality in your home is safe and your system is functioning properly," meaning that the air filter is specifically for the purpose of ensuring the health and safety of the tenants and the habitability of the units.

105.   Defendants mark up the cost of the air filters, but do not disclose this markup to tenants. Defendants retain a portion of the fee.

### D. *Legal Fees*

106. Additionally, Defendants require tenants to pay for Defendants' attorneys to review their ledgers for purposes of determining whether a tenant is allegedly in default on any lease obligation. This charge is reflected on tenants' ledgers as a "Legal Fees Recovery." Defendants charge the tenants for this attorney review, regardless of whether Defendants attempt to enforce any lease obligation through a legal action.

107. Even if Defendants did not enforce their illegal lease provisions, these provisions are nonetheless deceptive because consumers who read them are likely to believe they are enforceable, or that they have contractually waived their legal rights not to be responsible for certain costs, as well as repairs to Defendants' own property.

### E. *Late Fees*

108. Finally, in addition to charging the mandatory junk fees as described above, Defendants also engaged in illegal fee-gouging, such as deploying grossly inflated "late" rent penalties, and penalties that stack on top of penalties that, themselves, cause a tenant to fall behind (even when they are paying their actual rent). Tenants are forced to pay illegal fees because if they do not, Defendants will evict them.

109. Defendants' policy and practice is to stack penalties where possible, e.g. to charge tenants additional late fees if tenants carry any accrued balance of unpaid late fees or other charges, even when the tenants timely pay the monthly rent itself, and regardless of whether the outstanding balance is minimal. One late rent payment can and often does lead to multiple added fees.

110.     Defendants' late fees constitute illegal penalties under the laws of every state in which Defendants operate. The penalty is illegal, and thus, void, because it is excessive, and bears no relation to any actual damages incurred by Defendants when rent or other fees are paid late.

## III.     Plaintiffs' Experiences

### A.     Donna Sheard and Richard Allen

111.     Donna Sheard, Richard Allen, and their son diagnosed with autism, began renting a Home Partners-owned home through Defendants' NRTP program on or around January 12, 2023 in Edwardsville, Illinois.

112.     Sheard and Allen's written form lease initially set a base rent of $2,480.00 per month for the first year of the tenancy.

113.     Defendants charged Sheard and Allen $15 per month for HVAC Filter fees, $9.95 per month for UBSF, and $13 per month for Defendants' MRLP program.

114.     Sheard and Allen were not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

115.     Sheard and Allen placed numerous maintenance requests for the issued effecting the habitability of their home, including a leaking gas line that was improperly installed, electrical work, and the back stairwell is sinking causing a tripping hazard.

116.     Defendants have refused to repair these issues, or unreasonably delayed in fixing these issues, despite Sheard and Allen's requests.

### B. Gabrielle Todd

117. Todd and her family began renting a Home Partners-owned home through Defendants' RTP program on or about September 2, 2019, in Plainfield, Illinois.

118. Todd's written form lease initially set a base rent of $2,550.00 per month for the first year of the tenancy, with yearly rent hikes of approximately 3.9% year over year. The lease term was for a period of one year, and was subject to an automatic yearly renewal provision of up to four renewals, i.e., for a total of five years.

119. Defendants have assessed a $7.95 UBSF for each utility payment. Todd's lease is silent as to the nature and purpose of this fee.

120. Todd was not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

121. Less than two weeks after moving in, Todd and her family noticed that there were issues with the home's plumbing. Todd reported problems with the toilet, backed up sewer lines, and mold to Defendants through the portal. Defendants either denied the repair requests as "cosmetic" or delayed in completing the repairs and replacement of damaged drywall and carpet for years after Todd submitted the request.

122. Since Ms. Todd and her family started living on the property in 2019, they have placed over 190 maintenance requests for the house. These maintenance requests vary from issues related to plumbing, drywall, pest control, flooring, and mold.

123. On August 14, 2023, Todd sent a request for a sink repair via the Pathlight residential portal. This maintenance was not addressed until November 2, 2023. In the intervening time, Todd and her children went without running water in both the bathroom and kitchen sink.

### C. Lionel and Gina Johnson

124. Lionel and Gina Johnson's family began renting a Home Partners-owned home through Defendants' NRTP program on or about January 14, 2019, in Libertyville, Illinois.

125. The Johnson's written form lease initially set a base rent of $1,495.00 per month for the first year of the tenancy.

126. Defendants assessed the Johnsons $7.95 per month for UBSF for each utility payment. The Johnsons' lease is silent as to the nature and purpose of this fee.

127. Defendants also assessed the Johnsons a monthly $13 "liability coverage" fee for their so-called Replacement Renters' insurance.

128. The Johnsons were not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

129. Shortly after moving into the property, the Johnsons noticed issues with the plumbing and sewer lines in the property. The Johnsons were living without hot water, could not use either the bathroom showers or the bathroom sinks, and were unable to use both the dishwasher and washer.

130. The Johnsons also reported a carbon monoxide leak in the home. Defendants failed to correct the problem. It was not until approximately 2 or 3 months after the incident that Pathlight replaced the furnace.

25

131.    The Johnsons also noticed and reported that there were various leaks throughout the roof of the house. Eventually black spots began appearing on various areas of the ceiling. The Johnsons placed a maintenance request to address the issue, but this issue went unaddressed by Defendants.

132.    In August 2021, a large tree fell on the home. Defendants refused to send a vendor out to remove the tree for over three weeks. The Johnsons had to vacate the home with their four children and paid out of pocket for a hotel. They were never reimbursed by Defendants.

133.    The Johnsons demand a full return of their $1,495 security deposit, plus interest, penalties and other damages provided by law, and any other damages or equitable relief as the Court may order.

### D.    Barry Sewall

134.    Sewall rented a Home Partners-owned home through Defendant's RTP program in Minnetonka, Minnesota, beginning on or around July 29, 2016 until August 25, 2021.

135.    The written form lease initially set a base rent of $2,970 per month for the first year of the tenancy, with yearly rent hikes of approximately 3.6% year over year. The lease term was for a period of one year and was subject to an automatic yearly renewal provision of up to four renewals, i.e., for a total of five years. During the fifth and last year of his tenancy from July 29, 2020 through July 29, 2021, Sewall's monthly rent was $3,440.

136.     Sewall paid the amounts due and owing under the lease during his tenancy, and also maintained and provided evidence that he maintained the allegedly required insurance liability coverage.

137.     Sewall was not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

138.     During his tenancy, Sewall made numerous repairs for moisture and water intrusion in the home, including leaking shower drains, leaks and condensation in and around the mechanical room, and water intrusion from an ice dam. Sewall also reported a poorly working oven in or around 2020-2021. Defendant would sometimes send a vendor to the property to address these issues. Sewall also repaired a pre-existing large gap between the driveway and garage slab floor, hoping it would reduce the constant water in the garage. It did not, leading him to believe the garage water issues were due to a foundation or roof issue that Pathlight would not address because of the "AS-IS" language in the lease.

139.     On or about September 22, 2021, Pathlight sent Sewall its "Security Deposit Disposition." Among the line items in that letter, including false claims of "unpaid rent," "unpaid rent premium," and "unpaid late fees," which Sewall disputed and later resolved, Pathlight assessed Sewall for $15,000 for a "Remediation and Buildback" charge. This charge was shocking and outrageous to Sewall.

140.     Sewall disputed, and continues to dispute, that he owes Home Partners or Pathlight for any "Remediation and Buildback."

27

### E. Shamika Gregory and Jerome Gregory

141. Shamika and Jerome Gregory have rented a Home Partners-owned home through Defendants' RTP program in Brooklyn Center, Minnesota since September 9, 2021.

142. The Gregorys' written form lease initially set a base rent of $2,160 per month, plus a monthly $30 pet fee, for the first year of the tenancy, with yearly rent hikes of approximately 3.7% year over year.

143. The Gregorys had already purchased renter's insurance of their own. However, Pathlight told them this insurance was not on Pathlight's approved list, and told the Gregorys they must sign up for Defendants' renter's insurance program instead. The Gregorys did so and have continued to pay for Pathlight's renter's insurance each month of their tenancy.

144. The Gregorys have paid and continue to pay the amounts due and owing under the lease during their tenancy, and pay the allegedly required insurance liability coverage.

145. The Gregorys were not provided an opportunity to negotiate their rent amount, nor any other amounts due under the lease and deemed "additional rent."

146. When they moved in, the Gregorys noted the home had clearly never been cleaned, despite Pathlight's representation that the home would be cleaned and "move-in ready" prior to move-in. The Gregorys paid approximately $200 out-of-pocket to have the house cleaned.

147. During their tenancy, the Gregorys reported numerous repair and maintenance issues to Defendants, including floor repairs, roof repairs, broken

refrigerators, broken washers and dryers, gas leaks, and water intrusion and mold issues. Following nearly every request, Defendants either significantly delayed approving any repairs, or denied the repairs claiming they were "outside our standard scope of occupied home repairs and maintenance" and were allegedly the resident's responsibility.

148.    Defendants also attempted to erroneously charge the Gregorys for "legal fees recovery," despite the fact that no action was ever filed by Defendants in any court.

### F.    Frank Richmond

149.    Richmond and his family began renting a Home Partners-owned home through Defendants' RTP program from September 2021 to October 2022, in Port Orchard, Kitsap County, Washington.

150.    Richmond's written form lease initially set a base rent of $3,060 per month, plus a monthly $30 pet fee, for the first year of the tenancy, with yearly rent hikes of approximately 3.6% year over year. The lease term was for a period of one year, and was subject to an automatic yearly renewal provision of up to four renewals, i.e., for a total of five years.

151.    Defendants also charged Richmond additional monthly fees for its MRLP, UBS fees, HVAC filter fees, Water Utility Recovery fees, and late fees without his consent.

152.    Richmond was not provided an opportunity to negotiate the rent amount, nor any other amounts due under the lease and deemed "additional rent."

153.    Upon moving in, Richmond found the entire home had not been cleaned and was full of dirt and trash.

154.    Per Richmond's lease, Defendants are responsible for furnishing and maintaining certain appliances upon commencement of the lease period, including a refrigerator. Defendants did not supply a refrigerator until one week and several phone calls later.

155.    Richmond documented various damage to the house, including, but not limited to: chipped paint throughout the home; a broken fence; a back door that had been screwed shut; bubbling sheetrock joint tape, dents, nails and screws in the walls and ceiling; cracks in the garage floor; broken window screens; light fixtures hung improperly and dangerously; and broken light switch plates. Richmond submitted repair and maintenance requests to have these issues addressed, which Defendants denied.

156.    During his tenancy, Richmond also reported habitability issues to Defendants that needed to be repaired, including carbon monoxide leaks in the property and a septic system that was in violation of various codes and needed replacement. Defendants either delayed in responding to these items, or denied replacing and repairing these items claiming they were "resident care items."

157.    While Richmond understood that he would be required to pay for some utilities, he did not agree to pay for any pre-existing damage, nor was he provided any reimbursement or consideration for undertaking any repairs.

158.   After vacating the premises, Defendants withheld portions of Richmond's security deposit without lawful basis.

159.   In addition, in December 2022, two months after Richmond and his family left the home but after Richmond had filed suit in this case, Defendants charged Richmond a $250 "legal services recovery fee" (i.e., an attorneys' fee). Defendants did not provide Richmond notice of this fee when they assessed it.

### G.   Michael McDermott and Kelley McDermott

160.   The McDermotts began renting a Home Partners-owned home through Defendants' RTP program on July 10, 2018 in Tacoma, Washington.

161.   The McDermotts' written form lease initially set a base rent of $3,195 per month.

162.   While the McDermotts understood that they would be required to pay for some utilities, they did not agree to pay for any pre-existing damage, nor were they provided any reimbursement or consideration for undertaking any repairs.

163.   Upon the McDermotts' move-in, the entire property was covered in weeds and overgrown grass. Pathlight did not respond to the McDermotts' requests to address this issue and the McDermotts paid out-of-pocket to eradicate the weeds.

164.   During their tenancy, the McDermotts reported numerous repair and maintenance issues to Defendants, including a fence that had fallen in a storm, a broken dishwasher, black mold and water remediation, and damaged walls and floors. Despite these repair requests, Defendant has unnecessarily delayed or refused to cover the repairs.

### H.    Chance Gallo

165.    Gallo currently rents a Home Partners-owned home through Defendants' NRTP program in Puyallup, Washington. Gallo and his family began renting through Defendants in June 2023.

166.    The written form lease initially set a base rent of $3,150 per month, plus a monthly $30 pet fee, for the first year of the tenancy.

167.    Gallo has paid all rent and fees owed, including a fee for HVAC filters that Defendants sent through their third-party vendor, Second Nature. Gallo reported several times that the HVAC filter was not the proper size, to no avail.

168.    Gallo was not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

169.    When he moved in, Gallo was not provided a written statement or checklist signed by Defendants, describing the condition of the property, including the condition and cleanliness of or existing damages to the premises, fixtures, equipment, appliances, and furnishings.

170.    During their tenancy, Gallo and his family members have placed maintenance and repair requests through the rental portal or by calling Pathlight, many of which Defendants have denied as "resident responsibility" or "as-is". These include, but are not limited to, requests related to the move-in condition of the home and yard, which contained a metal shed that reeked of urine and feces, as well as broken gates.

171.    Often when Defendants have deigned to repair an issue, the work has not been commenced in a timely manner, nor has it been completed promptly.

### I.    Sheila Nasilasila

172.    Nasilasila and her family began renting a Home Partners-owned home through Defendants' NRTP program in March 2023 in Lake Tapps, Washington.

173.    The written form lease initially set a base rent of $2,695 per month, plus a monthly $30 pet fee, for the first year of the tenancy.

174.    When they moved in, Nasilasila was not provided a written statement or checklist signed by Defendants, describing the condition of the property, including the condition and cleanliness of or existing damages to the premises, fixtures, equipment, appliances, and furnishings.

175.    Nasilasila was not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

176.    In May 2023, the dryer at the property broke due to a broken sensor. Nasilasila placed a work order for the repair, which Defendants denied as "resident responsibility." Nasilasila and her husband paid for and performed the repair.

177.    About a year later, during record heat waves in the Seattle area, the central air conditioning unit broke. Nasilasila placed a maintenance request through the rental portal. Pathlight sent multiple vendors over multiple weeks, but the unit was not fixed until Nasilasila retained the undersigned counsel, who in turn contacted Defendants' counsel.

### J.    Erin Wise

178.    Wise is a former tenant, having rented a Home Partners-owned home through Defendants' RTP program in Tacoma, Washington since June 2023-August 2023.

179.    The written form lease initially set a base rent of $2,500 per month, plus a monthly $30 pet fee, for the first year of the tenancy, with yearly rent hikes of approximately 3.6% year over year.

180.    When Wise moved in, the home was not "move-in ready" as promised. Wise reported damage to the condition of the property, showing with pictures that it required extensive cleaning, exhibited mold and mildew, and still contained appliances and damaged items that the previous occupant had left on the premises, including exposed wires. Wise was shocked at the move-in condition of the home.

181.    After Defendants sent the "security deposit disposition letter," Defendants charged Wise for allegedly damaged items and materials that she had documented as already damaged upon move in. Defendants did not agree to refund all of the damage items, charging Wise an additional $162.17.

182.    Wise reluctantly agreed to pay the charge. Defendants, however, attempted to use a debt collector to collect on the amount, even after Wise had paid the amount.

### K.    Michael Curran and Christa Curran

183.    The Currans rented a Home Partners-owned home under Defendants' RTP program from December 2019 to August 2022 in Colorado Springs, Colorado.

184.    The Currans' written form lease initially set a base rent of $2,190 per month, plus a monthly $30 pet fee, for the first year of the tenancy, with yearly rent hikes of approximately 3.65% year over year.

185.    Defendants did not separately negotiate or set forth the list of maintenance and repair responsibilities they required the Currans to assume.

186.    Defendants also charged the Currans additional monthly fees for the MRLP, UBS fees, HVAC filter fees, Water Utility Recovery fees, and late fees without their consent. Neither the Anticipated Terms nor the Currans' lease discloses the nature and purpose of these fees.

187.    The Currans were not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

188.    During the Currans' tenancy, they submitted repair and maintenance requests to Defendants for numerous items, including the furnace, electrical panel, water service line, and sewer line. Despite submitting these repair requests, Defendants refused to timely repair these items, denied repair requests and told the Currans to submit the claims to their insurer, and refused to reimburse the Currans for their out-of-pocket expenses in repairing these items.

189.    Ultimately, the Currans paid approximately $5,955 to replace the furnace, approximately $2,500 for the electrical panel, and more than $8,100 to repair the service line. Defendants have not reimbursed the Currans.

190.    The Currans ultimately vacated the home in August 2022.

191.    Pathlight retained the Currans' entire security deposit and sent an itemized list of "chargeback items" upon move out, including, among other things, $135 for a new sliding screen door, though there was never a screen in the first place; $450 to paint the interior walls; and $185 to replace the master bedroom door that was reported broken upon move-in.

### L.    Latrice Jones-Byrd

192.    Jones-Byrd began renting a Home Partners-owned home through Defendants' RTP program in Douglasville, Georgia beginning on or around August 6, 2019.

193.    Jones-Byrd's written form lease initially set a base rent of $1,830.00 per month for the first year of the tenancy, with yearly rent hikes of approximately 3.8% year over year. The lease term was for a period of one year, and was subject to an automatic yearly renewal provision of up to four renewals, i.e., for a total of five years.

194.    Defendants have assessed the UBSF in the amount of $7.95 on top of each of Jones-Byrd's utility payments. Jones-Byrd's lease is silent as to the nature and purpose of this fee.

195.    Jones-Byrd was not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

196.    After moving into the house, Jones-Byrd discovered multiple issues with the home requiring repair despite Defendants' promises that the home would be move-in ready, including a non-working microwave, cracked and inoperable windows, and several non-working electrical outlets.

197.    When Jones-Byrd requested these issues be fixed, Defendants claimed that it was not their responsibility because she took the house "as-is." Jones-Byrd paid approximately $100 out-of-pocket for a functioning microwave.

198.    Jones-Byrd has complained numerous times to Defendants about her internet issues, ledger, late fees and improper utility charges, but Defendants have

continually told her that "someone is looking into it." However, she has yet to receive any additional information or see any additional action from Defendants.

**M.      LaQuita Dasher**

199.    Dasher rented a Home Partners-owned home through Defendants' RTP program in Atlanta, Georgia, from approximately November 13, 2021 to November 19, 2022.

200.    Dasher's written form lease initially set a base rent of $2,220 per month for the first year of the tenancy, with yearly rent hikes of approximately 3.6% year over year. The lease term was for a period of one year, and was subject to an automatic yearly renewal provision of up to four renewals, i.e., for a total of five years.

201.    During her tenancy, Defendants charged Dasher $15 per month for HVAC Filter fees, $9.95 per month for UBSF, and $13 per month for Defendants' MRLP. Dasher's lease is silent as to the nature and purpose of these fees.

202.    Dasher was not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

203.    After moving into the house, Dasher started to notice issues with the dishwasher and toilet, among other problems. Despite submitting repair and maintenance requests to Defendants, they refused to repair or replace the broken items.

204.    Dasher replaced the dishwasher and toilet and was never reimbursed.

205.    After moving out, Dasher, who requested and was denied the right to inspect the premises with Defendants' agent, was charged $500 in "patch and paint

37

throughout the home" on December 21, 2022. Defendants imposed this charge over a month after Dasher and her family vacated the premises.

206.    Defendants returned a portion of Dasher's security deposit, more than 30 days after she and her family had returned the property to the possession of the landlord. The line items charged included "replace 2 lightbulbs- garage" and "replace doorbell."

207.    On January 19, 2023, two months after Dasher and her family vacated the premises, Dasher received a "legal fees recovery" fee posted on her account which was valued at $1,125.00. On January 27, 2023, Dasher received another "legal fee recovery" charge of $30.57. After Dasher contacted Defendants repeatedly, they eventually credited Dasher's account for the legal fees. Over the course of her year tenancy with Defendants, Dasher was charged "legal fees recovery" six different times.

### N.    Ayoka Durham and Marcus Durham

208.    The Durhams began renting a Home Partners-owned home through Defendants' RTP program on September 4, 2021 in Hughesville, Maryland.

209.    The Durhams' written form lease initially set a base rent of $2,920 per month for the first year of the tenancy, with yearly rent hikes of approximately 3.8% year over year. The lease term was for a period of one year, and was subject to an automatic yearly renewal provision of up to four renewals, i.e., for a total of five years.

210.    Defendants charged the Durhams $15 per month for HVAC Filter fees, $9.95 per month for UBSF, and $13 per month for Defendants' MRLP program.

211. The Durhams were not provided an opportunity to negotiate these amounts, nor any other amounts due under the lease and deemed "additional rent."

212. During their tenancy, the Durhams submitted repair and maintenance requests to Defendants for numerous issues, including a broken hot water heater, the well stopped working, roof leaks, black mold, water intrusion, and the roof needed to be replaced. For every request, Defendants either denied the repairs as "resident responsibility," unreasonably delayed in scheduling the repairs, or refused to approve the contractor estimates for the repairs.

## LITIGATION HISTORY

213. On March 3, 2022, Plaintiff Sewall filed a class action complaint in the Northern District of Illinois against Defendants alleging violations of the Minnesota Consumer Fraud statute, violations of the Minnesota Deceptive Trade Practices Act, violations of the Minnesota Landlord-Tenant Act, and seeking declaratory relief, injunctive relief, and rescission. *See Sewall et al. v. Home Partners of America Inc., et al.*, No. 22-cv-01138 (N.D. Ill.). That matter was voluntarily dismissed without prejudice and re-filed in the Hennepin County District Court in Minnesota. *See Sewall, et al. v. Home Partners Holdings LLC, et al.,* No. 27-CV-22-10389 (Minn. Dist. Ct.) ("*Sewall*"). The Gregorys were added as named plaintiffs in the First Amended Complaint in the state matter.

214. In the *Sewall* litigation, Judge Christian Sande certified, in part, classes asserting claims for damages and for injunctive or declaratory relief under Minnesota law by order dated October 3, 2023. *See Sewall,* No. 27-CV-22-10389, Index # 202. The Court certified the damages class under Minn. R. Civ. P. 23.02(c) for Plaintiffs'

39

claims alleging violation of Minnesota's Prevention of Consumer Fraud Act, violation of Minnesota's Landlord-Tenant Act for breaching covenants of landlord, violation of Minnesota's Landlord-Tenant Act for illegally charging and collecting late fees, breaching the covenant of good faith and fair dealing, rescission, and unjust enrichment. The Court also certified an injunctive relief class under Minn. R. Civ. P. 23.02(b) for Plaintiffs' claims alleging violation of Minnesota's Deceptive Trade Practices Act, and Plaintiffs' claims for declaratory judgment and injunctive relief.

215.    On September 21, 2022, Plaintiffs Richmond and the McDermotts filed a class action complaint in the United States District Court for the Western District of Washington. *See Richmond, et al. v. Home Partners Holdings LLC, et al.*, No. 22-cv-05704 (W.D. Wash.) ("*Richmond*"). On November 18, 2024, the Court granted Plaintiffs' motion for leave to file a Fifth Amended Complaint. *Richmond*, Doc. 223. In their Fifth Amended Class Action Complaint, Plaintiffs Richmond, the McDermotts, Gallo, Nasilasila, and Wise asserted claims against Defendants for violations of the Washington Residential Landlord-Tenant Act, breach of their duty of good faith and fair dealing, and seeking declaratory relief and injunctive relief. *Id.*, Doc. 225.

216.    In the *Richmond* litigation, Judge Robert Bryan certified classes asserting claims for damages and for injunctive or declaratory relief by order dated November 19, 2024. *Id.*, Doc. 224. The Court certified the damages class under Fed. R. Civ. P. 23(b)(3) for Plaintiffs' claims alleging that Defendants illegally charged and collected late fees in violation of Washington's Residential Landlord-Tenant Act, that

40

Defendants illegally charged and collected attorneys' fees in violation of Washington's Residential Landlord-Tenant Act, that Defendants' violated Washington's Residential Landlord-Tenant Act by failing to provide a written move-in statement or checklist at move-in as required by RCW 59.18.260, and that Defendants' violated Washington's Residential Landlord-Tenant Act by failing to provide "a full and specific statement for the reason for withholding" security deposits at the time of move-out as required by RCW 59.18.280. The *Richmond* court also certified an injunctive relief class under Fed. R. Civ. P. 23(b)(2) for Plaintiffs' claims seeking injunctive relief and declaratory judgment.

217. Plaintiffs Curran previously filed a class action complaint in the United States District Court for the District of Colorado, captioned *Curran, et al. v. Home Partners Holdings LLC, et al.*, No. 1:23-cv-01279 (D. Colo.) ("*Curran*"). The District Court for the District of Colorado certified questions to the Colorado Supreme Court.

218. Plaintiffs Jones-Byrd and Dasher previously filed a class action complaint in United States District Court, for the Northern District of Georgia, captioned *Jones-Byrd, et al. v. Home Partners Holdings LLC, et al.*, No. 23-cv-05927 (N.D. Ga.) ("*Jones-Byrd*").

219. Plaintiffs Durham previously filed a class action complaint in United States District Court for the District of Maryland, captioned *Durham, et al. v. Home Partners Holdings LLC, et al.*, No. 23-cv-03490 (D. Md.) ("*Durham*").

220. Plaintiffs Sheard, Allen, Todd, and the Johnsons previously filed a class action complaint in the United States District Court for the Southern District of

Illinois, captioned *Sheard, et al. v. Home Partners Holdings LLC, et al.*, No. 23-cv-04012 (S.D. Ill.) ("*Sheard*").

## CLASS ACTION ALLEGATIONS

221. Plaintiffs bring this action on behalf of themselves, and all others similarly situated ("the Class") pursuant to Federal Rule of Civil Procedure 23.

222. The class periods for the below identified classes or sub-classes are contained within the class or subclass definitions.

223. Plaintiffs propose the following Multistate Class definition, subject to amendment as appropriate:

> All persons in every state and the District of Columbia in which Home Partners has leased homes, who are or were parties to leases with Home Partners, or who are or were household members or occupants listed in such leases, and who occupied the home at any time during the applicable Class Period.

224. Counts I, II, III, XII, XIII, XIV, and XV apply to all Class members.

225. Counts IV, V, VI, and VII apply to Class members in Minnesota homes since March 1, 2016.

226. Count VIII applies to Class members in Washington homes since September 21, 2016.

227. Counts IX, X, and XI apply to Class members in Colorado homes since May 1, 2017.

228. The following persons are excluded from the above Class definitions:

   a. All persons who entered into a new lease (as opposed to a renewal) with Home Partners on or after January 10, 2025;

b. All persons listed on a lease who are not of the age of majority;

c. Persons who properly execute and timely request exclusion;

d. Governmental entities;

e. Defendants and any of their parents, affiliates, or subsidiaries;

f. The presiding judge in this Court or any of the previously filed class action matters, and all of their immediate families and judicial staff.

229. The requirements for class certification under Federal Rule of Civil Procedure 23 are met as follows:

a. Plaintiffs are informed and believe, and on that basis allege, that there are thousands of persons who have entered into rental agreements with Defendants. As such, the members of the Class are so numerous that joinder of all members in one proceeding would be impracticable.

b. There are common questions of law and fact common to the Class, including without limitation:

i. Whether Defendants' contracts of adhesion illegally disclaim the covenants of habitability and violate state laws;

ii. Whether Defendants' lease provisions mislead or misled tenants;

      iii.     Whether Defendants illegally required tenants to obtain insurance to cover damage to Defendants' property;

      iv.     Whether Defendants have failed to return security deposits in full compliance with the law;

      v.     Whether Defendants mispresented the nature of their services through advertising with the intent to induce Class members to sign their contracts of adhesion;

      vi.     Whether Defendants' illegal and unenforceable lease provisions are unfair and deceptive trade practices under state statutes;

      vii.     Whether the members of the Class are entitled to damages and equitable relief, including injunctive and monetary relief.

c.     The claims of the Plaintiffs are typical of the claims of the members of the Class, who entered into rental agreements with Defendants and are now contractually bound to the misleading and unlawful terms of those agreements that breach the covenants of habitability and severely limit any recourse available to Plaintiffs and all members of the Class.

d.     The Plaintiffs will fairly and adequately represent the members of the Class and have retained counsel who are competent and experienced in class action and complex litigation.

230. The requirements of Rule 23(b)(2) are met as described below in Plaintiffs' request for injunctive relief, because Defendants have acted or refused to act on grounds that generally apply to the class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the class as a whole.

231. The requirements of Rule 23(b)(3) are met in that:

    a.    The questions of law common to the members of the Class predominate over any questions affecting only individual members.

    b.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by many individual members of the Class may be relatively small in relation to the costs of litigation, the expense and burden of individual litigation make it difficult, if not impossible, for members of the Class to redress the wrongs done to them individually. Furthermore, many of the members of the Class may be unaware that claims exist against Defendants.

    c.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The names and addresses of the members of the Class are available from Defendants. Notice will be provided to the members of the Class via first class mail and/or

by the use of techniques and a form of notice similar to those customarily used in class actions.

## TOLLING OF THE STATUTE OF LIMITATIONS

232. Certain Named Plaintiffs, on behalf of themselves and others similarly situated, filed complaints in Minnesota, Washington, Colorado, Illinois, and Georgia. The filing of these complaints continues to toll the statute of limitations for Class Members who rented homes from Defendants in these jurisdictions, because these matters have been stayed or administratively closed pending settlement in this matter.

233. The parties participated in a global mediation for these matters on December 5, 2024. As a result of that mediation, the parties reached a settlement in principle.

234. The filing of the above-referenced matters served to toll any applicable statutes of limitations and repose for the claims set forth in this Complaint.

## COUNT I
## Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
## 815 ILCS 505/1 *et seq.*

235. Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

236. Plaintiffs are "persons" as defined by 815 ILCS 505/1(c).

237. Defendant Home Partners Holdings LLC has its principal place of business in Chicago, Illinois.

238. Tenants, including Plaintiffs, receive all pre-lease documents from Home Partners' leasing and acquisitions teams in Chicago, Illinois.

239. Under the form leases, Defendants charge multiple illegal fees throughout Plaintiffs' and Class Members' tenancies. The form leases are drafted in Illinois, at Defendants' principal place of business, with the advice of their outside counsel, who are also located in Chicago, Illinois.

240. Defendants, through their agents, employees and/or subsidiaries, have repeatedly violated the Illinois CFA by knowingly, recklessly, or intentionally concealing, suppressing, misrepresenting, omitting, and/or failing to disclose material facts regarding Defendants' rental properties, rental practices, and practices as a landlord.

241. Defendants, through their agents, employees and/or subsidiaries, have repeatedly violated the Illinois CFA by knowingly or recklessly making false or misleading statements of fact and other representations regarding the characteristics and benefits of their properties and property management services.

242. Defendants' misrepresentations and unfair practices begin with dissemination of misleading information on their websites and Anticipated Terms documents, which are directed to tenants and their real estate agents and are intended to induce prospective tenants to enter leases. These misrepresentations, as set forth in paragraphs 2-10 and 60-80 above, falsely assure prospective tenants that they will not be undertaking onerous obligations under the leases. Even if Defendants could legally shift the burden of maintenance and repair onto tenants through their leases—which as noted above, they have not done—these statements have the

capacity to deceive. Tenants later learn that Defendants' leases and properties carry repair and maintenance obligations tenants did not intend to take on.

243. *The MRLP*: As described above, Defendants require tenants to comply with their "liability coverage" requirement for "damage to our property during your lease term." Defendants' "liability coverage" is substance over form—in reality, Defendants have engaged in the unlicensed sale of insurance. Defendants automatically enroll tenants in their Master Resident Liability Program for $13 per month. Defendants induce tenants to enroll in their Master Resident Liability Program by stating "that using an outside provider may cost $20 a month or more," despite the fact that the program does not cover the tenant's personal property.

244. *UBSF*: As described above, Defendants' websites and Anticipated Terms represent their monthly Utility Billing Service Fee is "to reimburse for utilities and service paid for by Landlord." In reality, it covers the administrative costs of hiring a third party, Conservice, to bill tenants for utilities that normally must be kept in the landlord's name, such as water, sewer, and trash. While tenants are also billed for the underlying water, sewer, and trash costs, they must also pay-to-pay for these utilities. This fact is not disclosed in leases, nor in any of the "Anticipated Terms" sent to Plaintiffs and prospective tenants. Defendants' leases are entirely silent on the nature and purpose of this fee. This fee is at least $7.95 per month. Defendants retain at least a portion of this fee and thus the fee does not reflect the actual cost of administering utilities.

245. ***HVAC filter fee***: As described above, until recently, Defendants required tenants to participate in a mandatory HVAC filter program, through which they charged tenants a mandatory $15 fee each month for HVAC air filter replacements. Defendants represent their mandatory HVAC filter program "ensures that you have the best possible air quality in your home." This fee misleads tenants into believing it is their responsibility to keep the homes in compliance with state and municipal law, when it is actually Defendants' responsibility. Defendants further represent "[e]ach shipment contains the exact number of high-quality filters your home needs at the time you need to change them." Defendants mark up the cost of the air filters, but do not disclose this markup to tenants.

246. Defendants have repeatedly engaged in unfair and deceptive acts and practices through their lease terms and rental practices. Presenting their rental programs as the next best thing to actual home ownership, Defendants mislead tenants into entering contracts of adhesion that purport to waive or modify Defendants' legal obligations as landlords and Plaintiffs' obligations as tenants. Defendants' leases include numerous other unenforceable, misleading and illegal lease provisions, including, but not limited to a disclaimer of the implied warranty of habitability; provisions shifting the burden of maintenance and repair onto tenants without consideration, and without specifying the repairs or maintenance tenants must make; force-placing the tenant in renters' insurance that covers damage to Defendants' property; and requiring tenants to pay for cleaning and other lease

49

termination fees regardless of whether the alleged damage is caused by ordinary wear and tear.

247.     Additionally, Defendants' leases state the "amount of Rent was agreed upon based on the express understanding that Tenant will be responsible for the maintenance needs of the Premises as provided in this Lease and in the absence of Tenant's agreement to maintain the Premises at its cost in accordance with the terms of this Lease, Landlord would have charged a higher rent amount." This provision is false. Defendants do not allow tenants to negotiate the amount of rent, or any other contract term.

248.     Defendants intended to induce Plaintiffs and the Class to rely on their misrepresentations and omissions in promoting and renting Defendants' rental properties.

249.     Thus, Defendants' conduct, practices, and actions described in this Complaint, with the intent that others rely thereon in connection with Defendants' rental practices, constitute multiple separate violations of the Illinois CFA.

250.     Defendants' unfair or deceptive acts or practices had a tendency or capacity to mislead and create a false impression in consumers, and were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and the Class, about the true nature of Defendants' rental properties, rental practices, and landlord practices, and the maintenance and repair obligations the tenants were required to assume under the leases.

251. Defendants' misrepresentations and omissions were material to Plaintiffs and the Class because they impact basic human needs: shelter, health and safety.

252. Had Plaintiffs and the Class known the truth and true value of Defendants' rental properties, they would not have rented a home through Defendants, or they would have paid significantly reduced rent.

253. Plaintiffs and the Class had no way of discerning Defendants' misrepresentations were false and misleading, and did not and could not have unraveled Defendants' deception on their own.

254. Defendants had an ongoing duty to consumers, including Plaintiffs and the Class, not only to refrain from their unfair and/or deceptive representations and practices, but Defendants also had a duty to disclose all material facts concerning the rental properties because they possessed exclusive knowledge of the condition of and defects within the properties and the rental services they would actually provide.

255. As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and the Class have suffered, and will continue to suffer injury, ascertainable losses of money and/or property, and monetary and non-monetary damages, including not receiving the benefit of their bargain.

256. Defendants' unlawful acts and practices affect the public interest because hundreds, if not thousands, of renters and prospective home buyers in Illinois are targeted by Defendants' omissions and misstatements, and these omissions and misstatements have the potential to deceive thousands of consumers in the future.

The prevention of such false and misleading information is in the public interest. Defendants are sophisticated real estate investors and property managers, and Plaintiffs and the Class have no power to bargain any terms of Defendants' contracts of adhesion.

257.    As a result of Defendant's conduct, Plaintiffs and the Class are entitled to an award of damages, an order enjoining Defendants' unfair or deceptive acts and practices pursuant to 815 ILCS 505/7, actual damages, reasonable attorney fees and any other just and proper relief available pursuant to 815 ILCS 505/10a.

## COUNT II
## Violation of Uniform Deception Trade Practices Act
## 815 ILCS 510/1, *et seq.*

258.    Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

259.    Defendants have repeatedly violated the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2 subdivision (a), by engaging in the deceptive and fraudulent conduct described in this Complaint with respect to the rental of residential properties. Those deceptive acts and practices include, but are not limited to:

a.    Representing to consumers that they do not negotiate rental rates or purchase prices while requiring consumers to sign leases stating that such amounts have been negotiated;

b.    Representing to consumers that they take the property "AS IS" and must make and pay for maintenance and repairs to Defendants' rental homes, when in reality, the law requires that

Defendants, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws;

c.    Representing to consumers that they must pay for liability coverage insurance every month to cover the maintenance of rental homes when the law requires that they, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws;

d.    Representing that consumers must pay fees related to lease management and administration, such as the UBSF, HVAC filter fees, "legal services recovery" for an attorney to review a tenant's file, as well as cumulative late fees.

260.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple separate violations of 815 ILCS 510/2. As a result of Defendants' conduct, Plaintiffs and Class Members are entitled to their damages,  costs and attorney fees incurred in bringing this action and any other relief the court deems just and proper.

261.    As a result of Defendants' conduct, Plaintiffs and the Class are entitled to an order enjoining Defendants' unfair or deceptive acts and practices, reasonable attorney fees and costs incurred in bringing this action, and any other relief the court deems just and proper pursuant to 815 ILCS 510/3.

## COUNT III
### Violations of the Illinois Landlord Tenant Act
### 765 ILCS 742

262.    Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

263.    If the landlord fails to make the repair within 14 days after tenant's notice, or more promptly as emergency conditions require, the tenant may have the repair made "in a workmanlike manner and in compliance with the appropriate law, administrative rule, or local ordinance or regulation." 765 ILCS 742/5.

264.    After submitting the paid bill to the landlord, the tenant may deduct from his or her rent the amount of the bill.

265.    Defendants' leases are illegal because they prohibit Plaintiffs and the Class from withholding rent. Plaintiff Todd's lease states "[t]enant agrees that it shall not have the right to deduct, withhold or offset any portion of the Rent from any claim it may have against Landlord, in any action by Tenant" and Plaintiffs Sheard and Allen's lease states they "shall not have the right" to "set off or deduct the cost of any repairs against Rent due or otherwise withhold Rent."

266.    Defendants' leases are also illegal because they shift the burden of maintenance and repair to tenants without consideration, e.g., for the tenants' agreement to repair and maintain, and for tenant services such as landscaping, snow removal, and other activities that allow Defendants to remain in compliance with local and state laws, rules, ordinances, or HOA agreements.

267.    Defendants' leases and leasing practices as described herein violate the Illinois Landlord Tenant Act.

268.    As a result of Defendants' conduct, Plaintiffs and the Class are entitled to their damages, costs, and attorney fees incurred in bringing this action and any other relief the court deems just and proper.

## COUNT IV
## Violation of Minnesota's Prevention of Consumer Fraud Act
## MINN. STAT. § 325F.69

*(By Plaintiffs Sewall and Gregory on behalf of themselves and Minnesota Lessees)*

269. Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

270. The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes services and real estate. Minn. Stat. § 325F.68, subd. 2 (2018).

271. Defendants have repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in fraud, false pretenses, false promises, misrepresentation, misleading statements, and deceptive practices, as described in this Complaint, with the intent that others rely thereon in connection with the rental or sale of their residential properties. Those practices include Defendants' unlawful lease provisions that deceive and mislead consumers into believing they (a) cannot negotiate their monthly rental rates or cannot negotiate the purchase prices of the home, while forcing them to sign agreements stating they in fact did, (b) must make all repairs to their rental homes, and (c) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes.

272. Defendants' conduct, practices, and actions described in this Complaint constitute multiple separate violations of Minn. Stat. § 325F.69.

273. As a result of Defendants' conduct, Plaintiffs and the Minnesota Subclass are entitled to an award of damages, an order enjoining Defendants' fraudulent, false, misleading, unfair, or deceptive acts and practices pursuant to

Minn. Stat. § 325F.70, and their reasonable attorney fees and costs incurred in bringing this action, and any other relief the court deems just and proper pursuant to Minn. Stat. § 8.31, subd. 3a.

## COUNT V
### Violation of Minnesota's Deceptive Trade Practices Act
### MINN. STAT. § 325D.44

*(By Plaintiffs Sewall and Gregory on behalf of themselves and Minnesota Lessees)*

274.  Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

275.  Defendants have repeatedly violated Minn. Stat. § 325D.44, subdivision 1, by engaging in the deceptive and fraudulent conduct described in this Complaint with respect to the rental of residential properties. Those deceptive acts and practices include, but are not limited to:

  a.   Representing to consumers that they do not negotiate rental rates or purchase prices while requiring consumers to sign leases stating that such amounts have been negotiated;

  b.   Representing to consumers that they take the property "AS IS" and must make and pay for maintenance and repairs to Defendants' rental homes, when in reality, the law requires that Defendants, not tenants, keep the homes in reasonable repair and in compliance with applicable health and safety laws;

  c.   Representing to consumers that they must pay for Renters Insurance every month to cover the maintenance of rental homes when Minnesota law requires that they, not tenants, keep the

homes in reasonable repair and in compliance with applicable health and safety laws; and

d.    Representing that consumers must pay fees related to lease management and administration, such as a UBSF, "legal services recovery" for file review, as well as cumulative late fees, in violation of Minnesota law.

276.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple separate violations of Minn. Stat. § 325D.44, subdivision 1.

277.    As a result of Defendants' conduct, Plaintiffs and the Minnesota Subclass are entitled to order enjoining Defendants' unfair or deceptive acts and practices pursuant to Minn. Stat. § 325D.45, subd. 1, and their reasonable costs and attorney fees and any other just and proper relief available pursuant to Minn. Stat. § 325D.45, subd. 2.

## COUNT VI
### Violation of Minnesota's Landlord-Tenant Act for Breaching Covenants of Landlord
### MINN. STAT. § 504B.161

*(By Plaintiffs Sewall and Gregory on behalf of themselves and Minnesota Lessees)*

278.    Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

279.    Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota's Landlord Tenant Act, Minn. Stat. § 504B.161, subdivision 1(b). Among other things, Defendants' leases, including the burden-shifting repair provisions, constitute violations of subdivision 1(b)

because they are attempts to waive and modify the Covenants of Habitability required by subdivision 1(a).

280.    As a result of Defendants' conduct, Plaintiffs and the Minnesota Subclass are entitled to their damages, costs, and attorney fees incurred in bringing this action and any other relief the court deems just and proper.

## COUNT VII
### Violation of Minnesota Landlord-Tenant Act For Charging Late Fees
### MINN. STAT. § 504B.177

*(By Plaintiffs Sewall and Gregory on behalf of themselves and Minnesota Lessees)*

281.    Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

282.    Defendants' conduct described above constitutes multiple separate violations of Minnesota's Landlord Tenant Act, Minn. Stat. § § 504B.177, by charging tenants more than eight percent of their alleged overdue rent payments. Each time Defendants imposed a late-payment fee in the manner prescribed by the form lease, as described above, Defendants charge substantially more than eight percent as a penalty for late rent payments in violation of Minn. Stat. § 504B.177. The Minnesota Office of Attorney General ("OAG") recently issued an opinion letter stating that "[p]enalizing a late rent payment at the statutory maximum [of eight percent] violates the statute because…imposing the maximum late fee multiple times on the same late payment results in the late fee exceeding the eight percent statutory cap." OAG June 30, 2021 Opinion Letter.

283.    Defendants' method of applying late fees to amounts charged as base and additional rent results in cumulative late fees on the same late payment, in violation of Minnesota law.

284.  As a result of Defendants' conduct, Plaintiffs and the Minnesota Subclass are entitled to their damages, costs, and attorney fees incurred in bringing this action and any other relief the court deems just and proper.

**COUNT VIII**
**Violation of Washington Residential Landlord-Tenant Act**
**WASH. REV. CODE § 59.18**

*(By Plaintiffs Richmond, the McDermotts, Gallo, Nasilasila, and Wise on behalf of themselves and Washington Lessees)*

285.  Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

286.  Defendants have violated various provisions of the Washington Residential Landlord-Tenant Act, Wash. Rev. Code §§ 59.18, *et seq.*, by failing to comply with applicable laws pertaining to written rental agreement requirements and the duties of the landlord, including, but not limited to, Wash. Rev. Code §§ 59.18.060(1)-(11), 59.18.115, 59.18.070. Plaintiffs have fully performed all obligations as tenants in accordance with Washington State law and properly notified Defendants of defective conditions under Wash. Rev. Code § 59.18.070 and § 59.18.115.

287.  Defendants' failure to carry out their duties is evidenced by their assignment of repair and maintenance duties, including landlord duties under § 59.18.060, to tenants without consideration. Defendants require tenants to perform or pay for routine maintenance and repair to the premises of Defendants' rental homes, even where the condition is attributable to wear and tear resulting from ordinary use, including to doors, windows, screens, HVAC units, plumbing, etc. Defendants also require tenants to perform or pay for maintenance of the premises

to ensure Defendants' compliance with applicable laws, such as nuisance laws or ordinances applicable to landscaping, landscape and yard maintenance, or snow and ice removal.

288.    Under Wash. Rev. Code § 59.18.360, Defendants and tenants may agree, in writing, to exempt themselves from the provisions of the Residential Landlord-Tenant Act ("RLTA"), including but not limited to Wash. Rev. Code § 59.18.060. None of those conditions have been met because (1) there is no separate agreement in writing outside of the form lease; (2) there is substantial inequality in the bargaining position between Defendants and their tenants; (3) through Defendants' internal policies and practices, Defendants have exempted themselves from adhering to the provisions of the RLTA in violation of public policy ensuring safe and sanitary housing; and (4) no local county prosecutor's office, the consumer protection division of the attorney general's office, nor attorneys for any tenant have approved in writing any application for exemption.

289.    Defendants' failure to comply with 59.18.360 constitutes an attempt by Defendants to obtain an agreement in which tenants agree to waive or forgo RLTA rights and remedies. Wash. Rev. Code § 59.18.230(2)(a).

290.    Under the RLTA, "Rent … means recurring and periodic charges identified in the rental agreement for the use and occupancy of the premises, which may include charges for utilities. Except ... [Rent] do[es] not include nonrecurring charges for costs incurred due to late payment, damages, deposits, legal costs, or other fees, including attorneys' fees." Wash. Rev. Code § 59.18.030.

291. Under the RLTA, a landlord may only charge late fees on "rent" that is more than five days past due. Wash. Rev. Code § 59.18.170(2). Defendants have violated the RLTA by charging late fees on the cumulative balance of monies owed, including for non-rent legal and late payment costs, amounts not authorized to be included as "rent" by the RLTA. Wash. Rev. Code § 59.18.030 (29), .170(2)-(3), .230(2)(f), .283.

292. Defendants have violated the RLTA by charging "legal services recovery fees" without a court order or other finding that they have been the prevailing parties in a legal action. Multiple provisions of the RLTA also contemplate an award of reasonable attorneys' fees to prevailing parties in actions brought under the RLTA. But the RLTA does not permit landlords to use leases to require tenants to pay the landlord's attorneys' fees even where the landlord is not the prevailing party. Wash. Rev. Code § 59.18.230(1)(c). Defendants' leases require tenants to pay for their attorneys' fees irrespective of whether they are the prevailing parties in an action, and Defendants enforce these lease provisions.

293. Defendants have unlawfully collected or retained Plaintiffs' security deposits in violation of Wash. Rev. Code § 59.18.260-.280.

294. Defendants, through their conduct, are liable for causing economic and noneconomic damages to Plaintiffs in an amount to be proven at trial.

295. As a result of Defendants' conduct, Plaintiffs are entitled to an award of damages, costs, and attorney fees incurred in bringing this action, and any other relief the court deems just and proper under Wash. Rev. Code §§ 59.18 *et seq*.

## COUNT IX
## Violation of the Colorado Consumer Protection Act
## COLO. REV. STAT. §§ 6-1-101 *et seq.*

*(By Plaintiffs Curran on behalf of themselves and Colorado lessees)*

296.   Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

297.   Plaintiffs are "persons" as defined by Colo. Rev. Stat. § 6-1-102(6).

298.   The Colorado Consumer Protection Act ("Colorado CPA") prohibits unfair, unconscionable, and deceptive acts or practices in the course of the person's business, vocation, or occupation. Colo. Rev. Stat. § 6-1-105.

299.   Defendants, through their agents, employees and/or subsidiaries, have repeatedly violated the Colorado CPA by knowingly, recklessly, or intentionally concealing, suppressing, misrepresenting, omitting, and/or failing to disclose material facts regarding Defendants' rental properties, rental practices, and practices as a landlord.

300.   Defendants, through their agents, employees and/or subsidiaries, have repeatedly violated the Colorado CPA by knowingly or recklessly making false or misleading statements of fact and other representations regarding the characteristics and benefits of their properties and property management services.

301.   Defendants' misrepresentations and unfair practices begin with dissemination of misleading information on their websites and Anticipated Terms documents, which are directed to tenants and their real estate agents and are intended to induce prospective tenants to enter leases. These misrepresentations, as set forth in paragraphs 60-80 above, falsely assure prospective tenants that they will not be undertaking onerous obligations under the leases. Even if Defendants could

legally shift the burden of maintenance and repair onto tenants through their leases—which as noted above, they have not done—these statements have the capacity to deceive. Tenants later learn that Defendants' leases and properties carry repair and maintenance obligations tenants did not intend to take on.

302. Defendants' misleading and unfair practices also include unlawful lease provisions that deceive and mislead consumers into believing they (a) cannot negotiate their monthly rental rates or cannot negotiate the purchase prices of the home, while forcing them to sign agreements stating they in fact did, (b) must make repairs to their rental homes that are not the tenants' responsibility, (c) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes, (d) representing to consumers that they take the property "AS IS" and must make and pay for maintenance and repairs to Defendants' rental homes, when the law requires that Defendants, not tenants, keep the homes in compliance with applicable health and safety laws, and (e) must pay for other lease administration fees such as the HVAC filter fee, UBSF, Defendants' attorneys' legal fees.

303. With regard to liability coverage, Defendants induce tenants to enroll in their Master Resident Liability Program by stating "Note that using an outside provider may cost $20 a month or more," despite the fact that the program does not cover the tenant's personal property. Defendants automatically enroll tenants, including Plaintiffs, in the Master Resident Liability Program.

304.    Defendants also mislead tenants as to the nature and characteristics and benefits of the fees assessed throughout the tenancy:

> a.  UBSF: Defendants' websites and Anticipated Terms represent this fee is to reimburse for utilities and service paid for by Landlord, when in reality, it covers the administrative costs of hiring Conservice to bill tenants for utilities. This fact is not disclosed in leases, nor in any "Anticipated Terms" sent to Plaintiffs and prospective tenants. Defendants' leases are entirely silent on the nature and purpose of this fee.

> b.  Legal service fees: Defendants assess legal fees on Plaintiffs' and other tenants' ledgers for outside attorneys to review tenants' ledgers and files, regardless of whether Defendants bring an eviction action and regardless of whether they prevail in an eviction action.

> c.  HVAC filter fee: Defendants charge tenants, including Plaintiffs, a mandatory $15 fee each month for HVAC air filter replacements. Defendants represent their mandatory HVAC filter program "ensures that you have the best possible air quality in your home." This fee misleads tenants into believing it is their responsibility to keep the homes in compliance with Colorado housing laws when it is actually Defendants' responsibility. Defendants further represent "[e]ach shipment contains the exact number of high-quality filters your home needs at the time you need to change them." In reality,

Defendants frequently send air filters that don't fit the HVAC unit, and fail to send air filters altogether while simultaneously assessing a monthly $15 charge.

305. Defendants intended to induce Plaintiffs and the Colorado Subclass to rely on their misrepresentations and omissions in promoting and renting Defendants' rental properties.

306. Thus, Defendants' conduct, practices, and actions described in this Complaint, with the intent that others rely thereon in connection with Defendants' rental practices, constitute multiple separate violations of the Colorado CPA.

307. Defendants' unfair or deceptive acts or practices had a tendency or capacity to mislead and create a false impression in consumers, and were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and the Colorado Subclass, about the true nature of Defendants' rental properties, rental practices, and landlord practices, and the maintenance and repair obligations the tenants were required to assume under the leases.

308. Defendants' misrepresentations and omissions were material to Plaintiffs because they impact basic human needs: shelter, health and safety.

309. Had Plaintiffs known the truth and true value of Defendants' rental properties, they would not have rented a home through Defendants, or they would have paid significantly reduced rent.

310. Plaintiffs had no way of discerning Defendants' misrepresentations were false and misleading, and did not and could not have unraveled Defendants' deception on their own.

311. Defendants had an ongoing duty to consumers, including Plaintiffs, not only to refrain from their unfair and/or deceptive representations and practices, but Defendants also had a duty to disclose all material facts concerning the rental properties because they possessed exclusive knowledge of the condition of and defects within the properties and the rental services they would actually provide.

312. As a direct and proximate result of Defendants' violations of the Colorado CPA, Plaintiffs have suffered, and will continue to suffer injury, ascertainable losses of money and/or property, and monetary and non-monetary damages, including not receiving the benefit of their bargain.

313. Defendants' unlawful acts and practices affect the public interest because hundreds, if not thousands, of renters and prospective home buyers in Colorado are targeted by Defendants' omissions and misstatements, and these omissions and misstatements have the potential to deceive thousands of consumers in the future. The prevention of such false and misleading information is in the public interest. Defendants are sophisticated real estate investors and property managers, and Plaintiffs have no power to bargain any terms of Defendants' contracts of adhesion.

314.    Plaintiffs are entitled to an order enjoining Defendants' unfair or deceptive acts and practices, actual damages, reasonable attorney fees and any other just and proper relief available pursuant to Colo. Rev. Stat. § 6-1-113.

## COUNT X
### Violation of Colorado's Warranty of Habitability Statutes
### COLO. REV. STAT. § 38-12-503 and § 38-12-506

*(By Plaintiffs Curran on behalf of themselves and the Colorado lessees)*

315.    Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

316.    Under Colo. Rev. Stat. § 38-12-503(1), in every rental agreement, the landlord is deemed to warrant that the residential premises is fit for human habitation.

317.    Under Colo. Rev. Stat. § 38-12-506, a landlord and tenant may agree in writing that the tenant is to perform specific repairs, maintenance tasks, alterations and remodeling necessary to comply with § 38-12-503, but that agreement must be set forth in a writing that is separate from the rental agreement and must be supported by adequate consideration.

318.    Defendants have violated § 38-12-506 by:

    a. Requiring tenants to sign leases stating that they have agreed to perform maintenance and repairs and that such amounts have been negotiated or agreed to, when in fact there is no writing separate from the rental agreement, supported by adequate consideration;

    b. Representing to tenants that they take the properties "AS IS" and without any warranty of habitability;

c. Inserting these obligations into their form contracts of adhesion rather than an agreement that is separate and distinct from their leases, by entering into these agreements in bad faith, with inadequate consideration, and by foisting the burden of maintenance and repair onto tenants who do not have the requisite skills to perform the work required.

d. Requiring tenants pay a mandatory, monthly $15 fee for HVAC air filter replacements to "ensure[] that you have the best possible air quality in your home" and to keep Defendants' HVAC units in working order.

319. A landlord breaches the warranty of habitability under Colo. Rev. Stat. § 38-12-503(1) if a residential premises is uninhabitable, in a condition that materially interferes with the tenant's life, health, or safety, and the landlord has received reasonably complete written or electronic notice of these conditions and failed to commence remedial action by employing reasonable efforts within the time-period prescribed by Colo. Rev. Stat. § 38-12-503(b).

320. Defendants have breached the warranty of habitability in multiple ways, including, but not limited to:

a. Failing to remedy conditions causing mold and dampness;

b. Failing to remedy malfunctioning appliances, plumbing and gas facilities, heating facilities, and electrical equipment;

c. Failing to remedy pest infestations;

    d.  Failing to maintain floors, stairways and railings in good repair;

    e.  Failing to comply with all applicable building, housing, and health codes.

321.  No Plaintiffs' actions have prevented Defendants from curing the conditions underlying the breach of the warranty of habitability.

322.  Plaintiffs are entitled to injunctive relief, damages, and any other relief the court deems just and proper.

**COUNT XI**
**Violation of the Colorado Landlord-Tenant Act for Wrongfully Withholding Security Deposits**
**COLO. REV. STAT. § 38-12-103, *et seq.***

*(By Plaintiffs Curran on behalf of themselves and the Colorado lessees)*

323.  Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

324.  Defendants retain tenants' security deposits to cover normal wear and tear in violation of Colo. Rev. Stat. § 38-12-103.

325.  Defendants also unlawfully retain tenants' security deposits to cover items that didn't exist in the home prior to move-in, as well as items that were damaged prior to move-in and reported in accordance with Defendants' pre-lease condition form policy.

326.  Plaintiffs are entitled to damages, costs, penalties and other equitable relief as the court deems appropriate pursuant to Colo. Rev. Stat. § 38-12-103(3).

**COUNT XII**
**Breach of Duty of Good Faith and Fair Dealing**

327.  Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

328.    Every agreement between Plaintiffs and Defendants includes terms and conditions which are not formally expressed but are implied by law. These implied terms are as binding as the terms that are in the written agreement.

329.    Defendants' residential leases contain a contractual duty of good faith and fair dealing that includes, but is not limited to, maintaining their rental properties in accordance with state law, including but not limited to refraining from the unfair, deceptive and misleading practices described herein.

330.    Defendants control the performance of virtually every term of their contractual relationship with tenants, including, but not limited to:

a.      the type of insurance tenants must carry and what that insurance covers;

b.      the manner in which tenants pay utilities and their rent;

c.      the type, cost and delivery of mandatory HVAC filter replacements;

d.      whether Defendants or tenants are responsible for certain repairs;

e.      whether Defendants will agree to make requested repairs and maintenance;

f.      the length of time tenants must wait for maintenance and repairs to be completed (if at all);

g.      forcing tenants to be on-site at the rental property when maintenance and repairs are to occur;

      h.     whether Defendants will accept rent payment through the resident portal; and

      i.      deductions from tenants' security deposits upon termination of the lease.

331.   Defendants' residential leases contain provisions that defer a decision regarding performance terms of the contract, leaving Defendants with the sole power to control the terms of performance after formation.

332.   Defendants' obligation to abide by the duty of good faith and fair dealing is heightened by the imbalance of power between Plaintiffs and Defendants. This substantial imbalance allows Defendants to implement the business scheme described herein and incorporated by reference. Defendants maintain unilateral discretion under their written agreements, which they abuse in bad faith.

333.   Defendants' actions and uniform course of conduct, including, but not limited to their unfair and deceptive practices, constructive refusal to make repairs and maintenance, and their unduly delay of repairs, breach their duty of good faith and fair dealing and unjustifiably hinder Plaintiffs' performance under the contracts.

334.   Further, Defendants' practices defy the reasonable expectations of Plaintiffs and the Class in entering into the landlord-tenant relationship, including, without limitation:

a. Their reasonable expectations that the property is "professionally managed" with "excellent customer service" and "24/7 emergency maintenance service";[10]

b. Their reasonable expectations that their landlord will make timely repairs and maintenance;

c. Their reasonable expectations that they will not be responsible for paying out-of-pocket for maintenance and repairs to the landlord's property; and

d. Their reasonable expectations that they will be permitted to use Defendants' rental portal and 800 numbers at all times for purposes of making a maintenance request, whether routine or emergency;

e. Their reasonable expectations that they will be permitted to make, and for Defendants to accept, full or partial payments of rent amounts charged, whether such amounts are past due or current;

335. Defendants have acted in bad faith by refusing to perform their contractual duties, effectively foisting the burden of maintaining their homes onto their tenants to generate more revenue and cut their own costs.

---

[10] https://www.pathlightmgt.com/search [https://web.archive.org/web/20241203042652/http://pathlightmgt.com/search] (last visited December 4, 2023).

336.   Plaintiffs have not impeded Defendants from performing their obligations under their lease agreements in any way.

337.   As a direct and proximate cause of Defendants' breach of the implied duty of good faith and fair dealing, Plaintiffs and the Class have suffered injury and damages, entitling Plaintiffs and the Class to the categories of remedies discussed herein.

## COUNT XIII
## Unjust Enrichment

338.   Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

339.   Plaintiffs and the Class conferred a benefit on Defendants by, among other things, paying rent and for the costs of maintenance that Defendants should have paid.

340.   Defendants voluntarily accepted and retained through today the benefits conferred by Plaintiffs and the Class' payments for rent and the costs of maintenance. The circumstances are such that it would be inequitable for the Defendants to retain these payments.

341.    Defendants consciously accepted the benefits that Plaintiffs and the Class conferred and those benefits were not conferred gratuitously.

## COUNT XIV
## Rescission

342.   Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

343.   Defendants control virtually every aspect of Plaintiffs' lease agreements as set forth in the general allegations hereof at paragraphs 70-112.

344. Defendants' lease agreements illegally and unfairly advantage Defendants through their misleading statements and deceptive practices, as described in this Complaint, with the intent that others rely thereon in connection with the rental or sale of their residential properties. Those practices include Defendants' unlawful lease provisions that deceive and mislead consumers into believing they (a) cannot negotiate their monthly rental rates, while forcing them to sign agreements stating they in fact did, (b) must make repairs to their rental homes because they are rented in an "AS-IS" condition or because Defendants say the repair is "resident responsibility," and (c) must pay for renters' insurance or use Defendants' hand-picked "liability coverage" every month to cover the maintenance of and physical damage to Defendants' rental homes.

345. Defendants represent to consumers that they must pay for their renters' insurance every month to cover all maintenance of their rental homes when the law requires they, not their tenants, maintain the premises in accordance with the warranty of habitability, illegally shifting the burden of maintaining Defendants' own properties onto their renters.

346. Defendants' form lease agreements are unconscionable contracts of adhesion, which are unenforceable as contrary to the public interest, policy and law.

347. Defendants' lease agreements deny consumers the legally cognizable warranty of habitability.

74

348. Plaintiffs and the Class have incurred out-of-pocket expenses for maintenance costs associated with their leases that should never have been their responsibility to pay as a direct result of the terms of the lease agreement.

349. As a direct and proximate result of Defendants' conduct, Defendants have received substantial benefits to which they have no entitlement, at Plaintiffs' and Class Members' expense, including maintenance costs, rent hikes, insurance premiums and other expenses.

350. Plaintiffs and the Class are entitled to compensation for all of the expenses they were illegally required by Defendants to bear, and that Defendants should have but did not pay.

## COUNT XV
## Declaratory Relief

351. Plaintiffs re-allege all prior paragraphs of this Class Action Complaint.

352. An actual controversy has arisen between Plaintiffs and the Class on one hand, and Defendants on the other hand, relating to the following matters:

353. Whether Defendants have unlawfully imposed maintenance, repair, and payment burdens and obligations on Plaintiffs under form contracts of adhesion.

354. Whether Defendants have unlawfully failed to maintain the homes rented by Plaintiffs and the Class.

355. What amounts Plaintiffs and the Class are entitled to receive in compensation.

356.     Whether Defendants unlawfully require tenants to procure renters' insurance to cover damage not caused by tenants to Defendants' building and structures, or to force place them in the "liability coverage" of Defendants' choosing.

357.     Whether the provisions of Defendants' form leases violate the warranty of habitability and illegally thrust the burden of repair onto to tenants.

358.     Whether tenants can be forced to sign agreements stating they either negotiated the rental or purchase price of the home when in fact, no negotiations took place.

359.     Plaintiffs and the Class further seek entry of declaratory judgment under 28 U.S.C. § 2201 in their favor which declares Defendants' practices as unlawful, and which provides for recovery of sums determined by this Court to be owed by Defendants to the Plaintiffs and Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to award judgment against Defendants as follows:

1.     Declaring that Defendants' actions, as set forth above, constitute multiple, separate violations of:

    a.  the common law claims pled in this complaint;

    b.  Illinois law under Illinois statutes 815 ILCS 505/1 *et seq*.; 815 ICLS 510/1 *et seq*.; 765 ILCS 742;

    c.  Minnesota law under Minnesota Statutes sections 325F.69, subdivision 1; Minnesota Statutes sections 325D.44, subdivision 1;

Minnesota Statutes section 504B.161, subdivision 1(a)-(b); Minnesota Statutes section 504B.177-78;

d. Washington law under Wash. Rev. Code § 59.18, and striking as void or unenforceable provisions of Defendants' leases that conflict with the RLTA, and requiring Defendants to modify their form lease agreements;

e. Colorado law under Colo. Rev. Stat. §§ 6-1-101, *et seq.*, Colo. Rev. Stat. §§ 38-12-501, *et seq.*; and

2. Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in deceptive practices and making false or misleading statements in violation of 815 ILCS 505/1 *et seq.;* 815 ILCS 510/1 *et seq.*; Minn. Stat. § 325F.69, subd. 1, Minn. Stat. § 325D.44, subd. 1; Colo. Rev. Stat. §§ 6-1-101, *et seq.*, and Colo. Rev. Stat. §§ 38-12-501, *et seq.*

3. Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from waiving or modifying RLTA requirements in written leases, in violation of Wash. Rev. Code 59.18.230;

4. Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or

77

controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from breaching the common law warranty of habitability;

5.     Awarding judgment against Defendants for Plaintiffs' damages, or restitution and disgorgement under the general equitable powers of this Court and any other authority for all persons injured by Defendants' acts as described in this Complaint;

6.     Awarding Plaintiffs their costs and reasonable attorneys' fees, as provided by applicable law or equity, and as the Court deems just and proper.

7.     Awarding prejudgment interest; and

8.     Granting such further relief as provided by law or equity, or as the Court deems appropriate and just.

Date:                                   By: */s/ Anne T. Regan*
                                        Anne T. Regan (IL #6280977)
                                        Nathan D. Prosser*
                                        **HELLMUTH & JOHNSON, PLLC**
                                        8050 West 78th Street
                                        Edina, MN 55439
                                        (952) 941-4005
                                        aregan@hjlawfirm.com
                                        nprosser@hjlawfirm.com

                                        Gary Klinger (IL #6303726)
                                        **MILBERG COLEMAN BRYSON**
                                        **PHILLIPS GROSSMAN, PLLC**
                                        227 W. Monroe Street, Suite 2100
                                        Chicago, IL 60606
                                        (865) 247-0080
                                        gklinger@milberg.com

                                        Scott Harris*
                                        Michael Dunn*
                                        **MILBERG COLEMAN BRYSON**
                                        **PHILLIPS GROSSMAN, PLLC**

78

900 W. Morgan St.
Raleigh, NC 27603
(919) 600-5000
sharris@milberg.com
michael.dunn@milberg.com

Joseph C. Bourne*
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
(612) 339-6900
jcbourne@locklaw.com

*\* to be admitted pro hac vice*

**ATTORNEYS FOR PLAINTIFFS**